# United States Court of Appeals
## For the First Circuit

No. 00-1609

BERNARDO HURTADO,

Petitioner, Appellee,

v.

JOHN TUCKER, ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Selya, Lynch, and Lipez,
Circuit Judges.

Annette C. Benedetto, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, was on brief, for appellant.

Charles S. Nierman, with whom Eugene Patrick McCann and Manzi and McCann, were on brief, for appellee.

March 29, 2001

**LYNCH, Circuit Judge**. A writ of habeas corpus was granted by the district court to Bernardo Hurtado, who had been convicted of various state drug crimes. The district court determined that the state appellate courts erred in concluding that the evidence at trial was sufficient to support Hurtado's conviction, and that, under the Antiterrorism and Effective Death Penalty Act ("AEDPA"),[1] the error was such as to qualify as either "contrary to, or [ ] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (West Supp. 2000). See Hurtado v. Tucker, 90 F. Supp. 2d 118 (D. Mass. 2000) ("Hurtado"). We reverse and clarify the limits on federal habeas review.

## I.

Bernardo Hurtado was convicted in Massachusetts in 1993 of trafficking in cocaine and possessing heroin with intent to distribute.[2] Hurtado's conviction was affirmed on appeal to the Massachusetts

---

[1]  See Pub. L. No. 104-132, 110 Stat. 1214 (1996) (amending 28 U.S.C. §§ 2244, 2253-55 and adding §§ 2261-66).

[2]  He was sentenced on the cocaine conviction to a minimum mandatory sentence of three years to three years and one day and on the heroin conviction to a term of not less than five nor more than seven years, to be served concurrently with the other sentence. While Hurtado has been paroled since serving his prison sentence, he still satisfies the "in custody" requirement of § 2254. See, e.g., Jones v. Cunningham, 371 U.S. 236, 243 (1963). Because of his conviction, the INS is attempting to deport Hurtado to his homeland of the Dominican Republic.

Appeals Court in 1996, see Commonwealth v. Hurtado, No. 94-P-1821, 660 N.E.2d 395 (Mass. App. Ct. Jan. 25, 1996), and his request for further review was denied by the Massachusetts Supreme Judicial Court later that year, see Commonwealth v. Hurtado, 663 N.E.2d 575 (Mass. 1996).

Petitioner then sought federal habeas relief pursuant to 28 U.S.C. § 2254 (West Supp. 2000). On May 22, 1998, the magistrate judge filed a report and recommendation recommending that relief be granted.[3] On February 29, 2000, the district court adopted the report and issued the writ. Hurtado, 90 F. Supp. 2d at 119-20. This appeal by the Commonwealth followed.

## II.

We summarize the presumptively-correct[4] factual determinations of the state court about the evidence presented at Hurtado's criminal trial. On January 24, 1991, the police executed two search warrants for 77 Newbury Street in Lawrence. The warrants had been obtained after six weeks of surveillance and four controlled drug buys there by a confidential informant. The building is a three-story structure with three apartments on the left and right-hand sides. An interior stairway on each side connects the three floors, but the two

---

[3]     The magistrate judge's report is annexed to and reprinted as part of the district court's published opinion. See Hurtado, 90 F. Supp. 2d at 120-35

[4]     See 28 U.S.C. § 2254(e) (West Supp. 2000). All other facts set out are those not disputed by Hurtado, unless otherwise noted.

sides of the building are not accessible to each other from inside the building. All apartments on the left-hand side and the third-floor apartment on the right-hand side were then vacant.

Hurtado and his wife, Lydia Nunez, lived with her six children, including her son Roberto Nunez, in the first-floor apartment on the right-hand side. Hurtado and Nunez had a daughter together.[5]

As the police entered the right side of the building, they heard shouts of "policia" and people running above them. Two officers ran to the second floor where they found Lydia and Roberto Nunez coming down from the third floor. Roberto Nunez had over $6,100 in cash on him. An unidentified male fled to the third floor and then escaped. Both Lydia and Roberto Nunez were arrested.

In the third-floor apartment, police found in plain view drug distribution paraphernalia and various drugs. No readable fingerprints were found there. Nothing was found in the second-floor apartment.

Hurtado was alone in the first-floor apartment at the time of the search. He emerged as the police entered. An officer announced that he had a warrant to search the apartment and escorted Hurtado back into the apartment. Hurtado sat at the kitchen table while the

---

[5] At trial, Hurtado disputed that he resided in the first-floor apartment; rather, he testified that he and Ms. Nunez were separated at the time of the search and that he was living at another address. Hurtado testified that he was at 77 Newbury Street at the time of the search because Ms. Nunez was ill and she wanted him to pick up their daughter. The jury was not required to accept that testimony, of course.

officers conducted their search. The officers described Hurtado as "cooperative." Upon request, Hurtado gave the officers his driver's license and his car registrations. The driver's license was expired and showed Hurtado's address at 77 Newbury Street. Hurtado, who was unemployed at the time, had registrations for two cars, a Lincoln Continental and an Audi. Both were registered to the 77 Newbury Street address. One of those registrations was dated January 14, 1991, just ten days before the raid. No drugs, drug paraphernalia, or any items suggestive of drug dealing were found on Hurtado.

The first-floor apartment was a different matter. The police found small empty plastic bags in a cup in the kitchen hutch, of the type commonly used to distribute 0.25 grams of cocaine. Also in the hutch was a small, white plastic bag of the type typically used for the distribution of 0.05 grams of heroin. It bore the stamp of a witch on it. A false plant pot in the kitchen contained three blue bags of the type often used for the distribution of 0.05 grams of heroin, which also bore witch stamps on them. Analysis indicated that the blue bags found on the first floor contained a residue of heroin.[6] In addition,

---

[6]    Witch stamps were found on the third floor and white and blue bags with witch stamps were found on the first floor, empty blue bags were found on the third floor and three blue bags were found on the first floor, 500 white bags were found on the third floor and a white bag with a witch stamp on it was found on the first floor, clear plastic bags were found in the third-floor apartment and in the hutch in the first-floor apartment, and a sixteenth of an ounce of cocaine was found on the third floor and a note found in the first-floor apartment had the number sixteen on it and indicated 'one for

on top of the dresser in the master bedroom, the police found a piece of paper containing drug notations plus some gold jewelry and a jewelry box.  They also found two expired passports belonging to Hurtado in that bedroom.

During the weeks of surveillance, police saw Hurtado outside the building "almost all the time."  His car was also seen parked in front of the building.  No one testified that they ever saw Hurtado participate in any of the drug transactions.  The police, through an informant, made controlled buys at the building from sellers described as Hispanic men in their early twenties and from Lydia Nunez.  Hurtado was approximately thirty-six years old at the time of his arrest.

## III.

A. Decision of the Massachusetts Appeals Court

In his state appeal, Hurtado argued that there was insufficient evidence to support his conviction on the drug charges.[7]  The Appeals Court considered whether the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to support a finding that Hurtado was guilty on each element of the offenses beyond a

---

seventy' -- the street value of a sixteenth of an ounce.

[7]    Hurtado also claimed that the trial court improperly admitted his passports into evidence and erred in refusing his request for disclosure of the name of the confidential informant.  These claims were rejected by the Massachusetts Appeals Court and by the federal district court.  They have not been raised by Hurtado before this court and have been waived.

reasonable doubt. See, e.g., Commonwealth v. Latimore, 393 N.E.2d 370, 374 (Mass. 1979) (applying test articulated by the Supreme Court in Jackson v. Virginia, 443 U.S. 307 (1979)).[8] The court concluded that there was sufficient evidence to support Hurtado's conviction as a principal under the theory of constructive possession of a controlled substance.[9]

In order to sustain a conviction under a theory of constructive possession in Massachusetts, the defendant must have known of the presence of the controlled substance and had "the ability and intention to exercise dominion and control over it." Commonwealth v. Cruz, 614 N.E.2d 702, 704 (Mass. App. Ct. 1993). The "elements of control and power or knowledge, coupled with the ability and intention to exercise dominion and control, may be inferred from circumstantial evidence . . . ." Commonwealth v. Brown, 609 N.E.2d 100, 102 (Mass. App. Ct. 1993). "While presence in an area where contraband is found alone

---

[8]    The Court's holding in Jackson represented an extension of its previous decision in In re Winship, 397 U.S. 358, 364 (1970), that due process requires that a conviction be supported by proof beyond a reasonable doubt. The Jackson standard must be applied with specific reference to the elements of the offense as defined by state law. See Campbell v. Fair, 838 F.2d 1, 4 (1st Cir. 1988).

[9]    The jury was instructed that the Commonwealth had to prove that Hurtado either constructively possessed the heroin and cocaine found in the third-floor apartment or engaged in a joint venture to distribute the drugs. The Appeals Court concluded that there was sufficient evidence to support Hurtado's conviction as a principal under the theory of constructive possession, which subsumes joint venture liability. See Commonwealth v. Pichardo, 647 N.E.2d 1236, 1237 (Mass. App. Ct. 1995).

cannot show the requisite knowledge, power, or intention to exercise control over the [contraband] . . . presence, supplemented by other incriminating evidence, will serve to tip the scale in favor of sufficiency." Commonwealth v. Handy, 573 N.E.2d 1006, 1009 (Mass. App. Ct. 1991).

The Appeals Court's determination of sufficient evidence was based on four findings. First, the court found that the jury could have reasonably concluded that Hurtado resided in the first-floor apartment with Lydia Nunez based on the following facts: Hurtado's expired passports were found in the bedroom with those of Nunez; Hurtado was carrying an expired driver's license and current car registrations listing his address as 77 Newbury Street; and Hurtado was seen "almost all the time" during the surveillance of the apartment.

Second, the court found that the jury reasonably could have concluded that the third-floor apartment was being used as a drug stash area. This conclusion was warranted in light of the matching bags and stamps found on the first and third floors and the drug note in the first-floor apartment referring to quantities of drugs found on the third floor.

Third, the court determined that the jury could have reasonably inferred that Hurtado knew of the heroin and cocaine present in the third-floor apartment based on the fact that police had observed him at 77 Newbury Street while drug transactions were occurring, that

Hurtado's passports were in the same bedroom as the note making reference to quantities of drugs found on the third floor, and that the first-floor kitchen contained bags typically used in drug distribution and identical to those found on the third floor.

Fourth, the court concluded that there was sufficient evidence that Hurtado had the ability and intention to exercise control over the drugs found in the third-floor apartment because he was present in the locked first-floor apartment alone, the packaging found in the first-floor apartment was similar to that found in the third-floor apartment, the drug note found in the bedroom by his personal papers mentioned quantities contained on the third floor, and Hurtado had access to the third floor via the staircase.

The Supreme Judicial Court denied further appellate review.

B. Magistrate Judge's Report and Recommendation

Hurtado sought federal habeas corpus relief in the district court. In a recommendation and report issued on May 22, 1998, the magistrate judge recommended that relief be granted based on Hurtado's insufficiency of the evidence claim. See Hurtado, 90 F. Supp. 2d at 120-35.[10] The magistrate judge acknowledged that, in the wake of the AEDPA, his task was to determine whether the Massachusetts Appeals Court's decision was "contrary to, or involved an unreasonable application of,

_____

[10]     The magistrate judge recommended that relief be denied as to Hurtado's other two claims. 90 F. Supp. 2d at 123.

9

clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1) (West Supp. 2000). Specifically, the magistrate judge focused on whether the Appeals Court's decision was an unreasonable application of <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307 (1979), the governing Supreme Court precedent for sufficiency of the evidence claims.  At the time the magistrate judge issued his report and recommendation, there was no First Circuit decision on the language contained in § 2254(d)(1).[11]   Although the Appeals Court did not cite to the constitutional rule on sufficiency of the evidence set forth in <u>Jackson</u>, it did articulate the substance of that rule, as the magistrate judge recognized.  The fault the magistrate judge found in the decision of the Appeals Court, and the sole basis of the recommendation to grant habeas relief, lay in the Appeals Court's application of the <u>Jackson</u> rule to a single element of the offense.  Specifically, while the magistrate concluded that there was sufficient evidence to infer Hurtado's knowledge of and ability to control the drugs in the third-floor apartment, he found the evidence insufficient to establish Hurtado's intent to exercise dominion and control over those drugs.

---

[11]     The magistrate judge said he used the approach previously used by the Seventh Circuit, requiring federal courts "'to take into account the care with which the state court considered the subject'" and to defer to the state court where it has given a "'responsible, thoughtful answer reached after a full opportunity to litigate.'" <u>See</u> <u>Gomez</u> v. <u>Acevedo</u>, 106 F.3d 192, 199 (7th Cir.) (quoting <u>Lindh</u> v. <u>Murphy</u>, 96 F.3d 856, 870-71 (7th Cir. 1996), <u>rev'd on other grounds</u>, 521 U.S. 320 (1997)), <u>vacated on other grounds sub nom. Gomez</u> v. <u>DeTella</u>, 118 S. Ct. 37 (1997).

The following reasoning animated this conclusion.  The magistrate judge thought that evidence of intent typically present in other cases was missing here.[12]  The magistrate judge also believed that the Appeals Court had been mistaken in two instances as to whether there was any primary evidence in the record to support certain statements in its opinion.  First, the Appeals Court overstated the evidence that Hurtado was seen at 77 Newbury Street when drug transactions were occurring there.  Having engaged in an admirably close reading of the record, the magistrate judge reasoned that there was no evidence that Hurtado was actually present when drug dealing was taking place; the evidence was only that he was often present in the area.  See Hurtado, 90 F. Supp. 2d at 128-30.  Second, the Appeals Court stated that the drug note was found on the dresser by Hurtado's personal papers.  In fact, the magistrate judge determined, there was no evidence that Hurtado's personal possessions or papers were found on or near the dresser

---

[12]  The magistrate judge noted, inter alia, that: the drug packaging found on the first floor was found in a common area rather than where Hurtado kept personal items; no drugs, drug paraphernalia, or money were found on Hurtado; no evidence existed to show that Hurtado ever participated in a drug transaction; Hurtado did not "act guilty" when the police arrived; and nothing in the drug note found in the master bedroom connected Hurtado to the drug operation -- indeed, no evidence established that Hurtado actually used the dresser on top of which the drug note was found.  See Hurtado, 90 F. Supp. 2d at 127.  The only circumstantial evidence that might show Hurtado's intent to exercise dominion or control over the drugs on the third floor, the magistrate judge found, was the fact that Hurtado lived on the first floor and that others who lived on the first floor (specifically, Hurtado's wife and stepson) operated the stash house on the third floor.  See id. at 128.

11

containing the drug note; the evidence was only that two expired passports of Hurtado's were found in the same bedroom as the note. See id. at 130-31. As a result, he concluded, the Appeals Court had engaged in an "unreasonable application of" the Jackson standard.

C. District Court's Decision

The district court adopted the magistrate judge's report and recommendation and concluded that much of the evidence "recited and relied upon by the state court did not exist; it was not in the record." Id. at 119. The district court also reviewed the report and recommendation in light of this court's interpretation of § 2254(d)(1) in O'Brien v. DuBois, 145 F.3d 16 (1st Cir. 1998), issued shortly after the magistrate judge filed the report.

The district court found that the magistrate judge incorrectly decided the case under § 2254(d)(1)'s "unreasonable application of" prong. On its reading of O'Brien, the district court found the claim should have instead been decided under the statute's "contrary to" prong. See Hurtado, 90 F. Supp. 2d at 120. The district court ultimately concluded, however, that for the reasons stated in the report and recommendation, the Appeals Court's decision was "contrary to" the clearly established Supreme Court law of Jackson v. Virginia, and that habeas relief should therefore be granted. Id.

**IV.**

The outcome of this case is dictated by the interpretation of

12

§ 2254(d)(1) contained in <u>Williams</u> v. <u>Taylor</u>, 529 U.S. 362 (2000), decided after our <u>O'Brien</u> decision. Neither the district court nor the magistrate judge had the benefit of the Supreme Court's views. The case is also our first occasion to apply <u>Williams</u> to a habeas petition challenging the sufficiency of the evidence under the <u>Jackson</u> standard.[13]

As amended by AEDPA, § 2254 "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." <u>Williams</u>, 529 U.S. at 412. The statute provides, in relevant part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was <u>contrary to, or involved an unreasonable application of</u>, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d)(1) (West Supp. 2000) (emphasis added).

As the Supreme Court has emphasized, the "contrary to" and "unreasonable application of" standards are different. Because the district court analyzed the case under the "contrary to" standard, and

_____

[13] Our post-<u>Williams</u> cases have involved ineffective assistance of counsel, <u>see</u> <u>Phoenix</u> v. <u>Matesanz</u>, 233 F.3d 77 (1st Cir. 2000), and jury instructions, <u>see</u> <u>Williams</u> v. <u>Matesanz</u>, 230 F.3d 421 (1st Cir. 2000). <u>Williams</u> v. <u>Taylor</u> involved a claim of ineffective assistance of counsel. When we refer to the <u>Williams</u> case, we mean the Supreme Court decision.

because we have usually considered that to be the first analytical question, we start there. See Williams v. Matesanz, 230 F.3d 421, 424 (1st Cir. 2000) (addressing the "contrary to" standard first).

"Contrary to" Standard

In Williams, the Supreme Court gave independent meanings to the "contrary to" and "unreasonable application of" clauses of § 2254(d)(1). See 529 U.S. at 405. The Court said that a state court decision would be "contrary to" the Court's clearly established precedent if it "applie[d] a rule that contradicts the governing law set forth in [the Court's] cases." Id. "A state-court decision will also be contrary to th[e] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from our precedent." Id. at 406.

Here, the Appeals Court applied the correct standard by articulating the standard set forth in Jackson. Indeed, this case presents a good example of one to which § 2254(d)(1)'s "contrary to" prong does not apply: "a run-of-the-mill state-court decision applying the correct legal rule from [the Supreme Court's] cases to the facts of a prisoner's case." Williams, 529 U.S. at 406. Because this case is therefore not properly analyzed under the "contrary to" standard, we turn to "the second step of the requisite analysis: whether the state court decision constitutes an unreasonable application of clearly established

14

Supreme Court case law." Williams v. Matesanz, 230 F.3d at 426.

Unreasonable Application of" Standard

The Supreme Court in Williams held that a state court decision would involve an "unreasonable application of" clearly established Supreme Court precedent if it "identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 413.[14] The Court also underscored that "an unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410 (emphasis in original). Indeed, because Congress used the word "unreasonable" in § 2254(d)(1), and not words like "erroneous" or "incorrect," a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

This court has since noted that the "unreasonable application of" prong of § 2254(d)(1) "reduces to a question of whether the state court's derivation of a case-specific rule from the [Supreme] Court's

---

[14] Williams raised but did not resolve the question of whether it would be an "unreasonable application of" clearly established federal law if the state court decision "unreasonably extend[ed] a legal principle from [Supreme Court] precedent to a new context where it should not apply (or unreasonably refuse[d] to extend a legal principle to a new context where it should apply)." Williams, 529 U.S. at 408. That issue is not involved in this case.

15

generally relevant jurisprudence appears objectively reasonable."

Williams v. Matesanz, 230 F.3d at 425 (quoting O'Brien, 145 F.3d at 25).

Habeas review involves the layering of two standards. The habeas question of whether the state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted. Here, that constitutional right is governed by Jackson's test of "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original). In a particular habeas case, it may be useful, although not mandatory, to review first the underlying constitutional issue, here the Jackson question.[15] Because

_____

[15] Compare Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir.) ("In Weeks v. Angelone, 528 U.S. 225 (2000), the Court first addressed the question whether the state court decision was erroneous and then, on the basis of its answer, concluded that AEDPA barred relief, rather than asking initially whether the state court decision was unreasonable under that statute."), cert. denied, __ U.S. __, 121 S. Ct. 340 (2000), and Bell v. Jarvis, 236 F.3d 149, 182-84 (4th Cir. 2000) (Motz, J., dissenting) ("The Williams Court thus recognized the appropriateness of federal habeas courts independently analyzing asserted claims as long as they 'also' engage in the AEDPA reasonableness determination.") (citation omitted), with Bell, 236 F.3d at 162 ("Nor is there a persuasive need to require federal habeas courts to offer opinions on significant constitutional questions simply in the interest of providing 'guidance' to the state courts within our circuits. . . . Our charge under the statute is only to determine whether the state court's adjudication of the claims before it was a reasonable one in light of the controlling Supreme Court law.") (emphasis in original). As one commentator has noted, "it is doubtful that state judges really prefer that federal courts spend their time asking not whether state court judgments are wrong, but whether they are unreasonably wrong." Larry W. Yackle,

16

two respected federal judges thought the evidence insufficient to meet the Jackson standard, we will assume the question is close and turn to the question of whether the state court decision was an "unreasonable application of" the Jackson standard.

The magistrate judge and district court thought the Jackson question had to be answered in the negative -- that, even viewing the evidence in the light most favorable to the prosecution, no rational juror could have convicted Hurtado. That was because they thought (1) two primary facts on which the state appellate court relied were not sufficiently established by the record;[16] and (2) certain facts common to cases upholding Jackson-based challenges to drug convictions obtained under a constructive possession theory were not in the record in Hurtado's case. They concluded that the reasonable inferences from a close reading of the remaining facts did not permit the conclusion that Hurtado intended to exercise dominion and control over the drugs on the third floor. We test that reasoning against Williams.

As this court said in Phoenix v. Matesanz, 233 F.3d 77 (1st Cir. 2000), the Supreme Court in Williams explicitly rejected the view,

_____

The Figure in the Carpet, 78 Tex. L. Rev. 1731, 1756 (2000).

[16]   Again, the articulated errors in the primary facts were that the police surveillance did not actually observe Hurtado involved in any drug transactions but merely saw him -- albeit frequently -- at the apartment; and that while Hurtado's personal papers were somewhere in the first-floor bedroom, their proximity to the drug note was never established.

adopted by the Fourth Circuit, that an "unreasonable application of" clearly established federal law requires that the application be one that <u>all</u> reasonable jurists would agree was unreasonable. <u>See</u> 233 F.3d at 80-81 (citing <u>Williams</u>, 529 U.S. at 409-10). The Court in <u>Williams</u> warned that an "'all reasonable jurists' standard would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one." 529 U.S. at 410. Thus, the test is an objective one and not so stringent as to require that all reasonable jurists agree the state court decision was unreasonable.

The Court in <u>Williams</u> acknowledged that "[t]he term 'unreasonable' is no doubt difficult to define," <u>id.</u>, but thought that the term was familiar to the legal world and to federal judges, <u>see</u> <u>id.</u> As the Second Circuit has pointed out, while "unreasonable" may be a familiar term to judges, its meaning varies significantly based on the context in which it is used. <u>See</u> <u>Francis S.</u> v. <u>Stone</u>, 221 F.3d 100, 109 n.12 (2d Cir. 2000); <u>see also</u> <u>United States</u> v. <u>Ocasio</u>, 914 F.2d 330, 336 (1st Cir. 1990) ("Reasonableness is a concept, not a constant.").

Still, some greater definition of the term "objectively unreasonable" can be attempted. Cognizant of the adage to mind what people do as well as what they say, we turn to what the Supreme Court actually did in <u>Williams</u> to see what light is shed on the "unreasonable

18

application of" prong.[17]  In Williams, a capital case, the Court held that the state supreme court's decision -- that there was no constitutional violation from ineffective assistance of counsel -- was an "unreasonable application of" clearly established federal law (as well as being "contrary to" clearly established federal law).  See 529 U.S. at 398-99.  In Williams, the Virginia Supreme Court had rejected the state trial judge's determination that counsel's ineffectiveness in introducing evidence possibly changed the result of the penalty phase and thereby prejudiced the petitioner.  The Virginia Supreme Court accepted that counsel was ineffective at the penalty phase, but concluded that the petitioner was not sufficiently prejudiced.  The U.S. Supreme Court, however, rejected the state supreme court's lack of prejudice conclusion as unreasonable because it misapprehended the correct prejudice standard and failed to evaluate the "totality of the available mitigation evidence."  Id. at 397.  Support for this conclusion came from the state supreme court's failure even to mention the defendant's sole argument in mitigation or to consider the possibility that mitigation evidence unrelated to dangerousness might have altered the jury's choice of the death penalty.  See id. at 398.  As a result, the state supreme court had

---

[17]    See also Supreme Court 1999 Term Leading Cases--Federal Jurisdiction and Procedure, 114 Harv. L. Rev. 319, 319 (2000) ("Despite describing 2254 as very deferential, the Court's application of the statute to the facts at hand demonstrated a stricter approach to habeas review than the Act's drafters may have anticipated.").

19

"failed to accord appropriate weight to the body of mitigation evidence available to trial counsel."  Id.

Williams and our own precedent thus suggest the following guidelines as to some, but not all, of the principles in an insufficiency-of-the-evidence case to be used in making the evaluation of "objective unreasonableness" under § 2254(d)(1):

(1) The focus of the inquiry is on the state court decision;

(2) Even with the deference due by statute to the state court's determinations, the federal habeas court must itself look to "the totality of the evidence" in evaluating the state court's decision;

(3) The failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable;

(4) The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and

(5) The absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness.

In Williams, the operation of these principles meant that a writ of habeas corpus should issue.  On the facts here, the operation of those principles means that a writ of habeas corpus should not issue.

Applying these standards, we cannot say that the state court's

20

affirmation of the verdict was objectively unreasonable, notwithstanding the Appeals Court's purported overstatements of fact.[18] The state court directly addressed the point at issue -- sufficiency of the evidence -- after its own survey of the entire record. It did not ignore material evidence or a key argument made by defendant. Its articulated reasons went to the conclusions it reached. Even if the state court were imprecise in its description of two primary facts, there is some room for mistakes under § 2254(d)(1). See Williams, 529 U.S. at 410. The real question is whether the state court decision is "objectively unreasonable," id. at 409, in its assessment that the weight of the evidence is sufficient under Jackson to support conviction.

Where it is a matter of what inferences[19] may be drawn, even

---

[18] A total failure by the state court to discuss any constitutional claim may mean that there was no such claim "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d) (West Supp. 2000); see Washington v. Schriver, No. 00-2195, 2001 WL 125332, at *6-*7 (2d Cir. Jan. 5, 2001). Here, however, the state appeals court adjudicated Hurtado's claims on their merits. We do not reach the question of how to analyze whether there has been an "unreasonable application of" clearly established federal law where there is no state court analysis of the claims.

[19] The Commonwealth urges that the "objective unreasonableness" standard of review requires that, in a Jackson case, we adopt a flat rule of deference to any state rule permitting inferences to be made, and refers us to a long line of Massachusetts cases sustaining drug convictions based on inferences from various types of evidence. We think that is the wrong approach to a Jackson challenge under § 2254(d)(1). The question of "objective unreasonableness" is one of federal law. That other cases with some factual similarities resulted in inferences of guilt is surely pertinent to the "objective unreasonableness" test, but it does not eliminate the need for case by case scrutiny. We suspect that there

21

before AEDPA this court noted that "variations in human experience suggest that one should expect a considerable range of reasonable estimates about what is likely or unlikely." Stewart v. Coalter, 48 F.3d 610, 616 (1st Cir. 1995) (reversing grant of writ of habeas corpus by district court where grant had been based on failure to meet the Jackson sufficiency standard). Post-AEDPA, in Williams v. Matesanz, we noted that where the argument over the correctness of the state court's ultimate conclusion is one of degree calling for a choice between credible (although mutually opposed) views, the habeas inquiry on objective unreasonableness ends. See 230 F.3d at 428-29.

As in Stewart,[20] we cannot say the prosecution's case was overwhelming. Nonetheless, it was not objectively unreasonable for the state court to conclude that a rational jury could convict Hurtado. Cf. United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995) (stating on

---

are few if any differences between what inferences state law would regard as reasonable and what inferences federal law would regard as reasonable. Nonetheless, historically some inferences or presumptions permitted by state law have been invalidated as contrary to the Constitution. See, e.g., Thompson v. Louisville, 362 U.S. 199, 205-06 (1960) (cannot infer "disorderly conduct" merely from fact that defendant was dancing in a café and became argumentative in asking why he was being arrested); cf. Zant v. Stephens, 462 U.S. 862, 885 (1983) (statutory aggravating circumstance required to impose death penalty would be invalid if "it authorizes a jury to draw adverse inferences from conduct that is constitutionally protected").

[20] In Stewart, the verdict of conviction had been reversed by Massachusetts Appeals Court and then reinstated by the SJC, before the grant of habeas relief by the district court. See Stewart, 48 F.3d at 612.

22

direct appeal that "[s]o long as the evidence, taken as a whole, warrants a judgment of conviction, '[the reviewing court] need not rule out other hypotheses more congenial to a finding of innocence'") (quoting United States v. Gifford, 17 F.3d 462, 467 (1st Cir. 1994)).

It was not unreasonable for the state court to conclude that the jury could reasonably have found that Hurtado both knew about and had the ability and intent to exercise dominion and control over the drugs. A jury, based on the evidence, could find that Hurtado continued to live at 77 Newbury Street, that Hurtado knew his wife worked as a drug dealer, and that their family home, where Hurtado was seen all the time by police, was a drug house for some period of time. One of Hurtado's cars was freshly registered to the drug house address. Hurtado also was trusted to be alone in the first-floor apartment of the drug operation. There existed clear drug-related links between the first and third-floor apartments, and important papers of Hurtado's were found along with a drug note in Hurtado's bedroom in the first-floor apartment. The jury could have thought it not at all credible that Hurtado, the husband, played no role in the drug operation, operated from his home. The jury could have rationally concluded that Hurtado was very much involved, based on this and other evidence not mentioned by the Appeals Court or the magistrate judge, such as that Hurtado owned two cars, an Audi and a Lincoln Continental -- hardly low-end cars -- when he was unemployed. In addition, the jurors saw Hurtado testify, and they, better than any

23

reviewing court, could assess whether to believe him as he told his story of innocence. Apparently they did not, and those issues of credibility are for the jury to decide.

We add that, as a general rule, federal courts should be particularly cautious about issuing habeas, on grounds of the objective unreasonableness of a state court's conclusion that the evidence is sufficient, where there has been a verdict of guilt by a jury of a defendant's peers, where the defendant's credibility was evaluated by the jury hearing his testimony, where that verdict has been affirmed on appeal in the state system, and where there is no claim of constitutional error in the conduct of the trial. Even on direct appeal, claims that the evidence was insufficient to support the verdict are "often made, but rarely successful." United States v. Moran, 984 F.2d 1299, 1300 (1st Cir. 1993).

We comment on several other points raised by the reasoning used in granting the writ. In determining that the state decision was objectively unreasonable, the magistrate judge focused on the process of reasoning followed by the state court and faulted it for overstating some facts. The reasoning used by the state court is, of course, pertinent. See Williams, 529 U.S. at 391-98 (examining reasoning of the state court); Williams v. Matesanz, 230 F.3d at 427-29 (same). The ultimate question on habeas, however, is not how well reasoned the state court decision is, but whether the outcome is reasonable. O'Brien, 145 F.3d

24

at 25; accord Neal v. Puckett, 239 F.3d 683, 696 (5th Cir. 2001). Of course, the better reasoned the state decision, the less likely it is that it could represent an unreasonable application of clearly established Supreme Court law. But even a poorly reasoned state opinion does not mean that the outcome represents an unreasonable application, see Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997), although, as we discussed above, it is certainly ground for further inquiry if the state court ignores material facts.

The magistrate judge also examined other state court decisions involving Jackson-based challenges to drug convictions on constructive possession theories and found none of those cases to be parallel. While the inquiry of looking to parallel cases is certainly legitimate to determine whether the application of Supreme Court precedent is objectively reasonable, the absence of precisely parallel cases does not alone establish objective unreasonableness.

Here, on the totality of the evidence, the conclusion of the state courts that the Jackson test had been met simply cannot be said to be objectively unreasonable.

We reverse and order entry of judgment denying the writ of habeas corpus.

So ordered.

25