**Andrew J. HAMMOND, III, Petitioner,**

v.

**Paul VERDINI, Respondent.**

**No. CIV.A.02–10008WGY.**

United States District Court,
D. Massachusetts.

March 3, 2005.

States v. Valencia–Copete, 792 F.2d 4, 6 (1st Cir.1986).

**15.** See the preceding footnote.

---

Dean A. Mazzone, Attorney General's Office, Boston, MA, for Paul Verdini, Paul Verdini, Respondents.

Michael R. Schneider, Salsberg & Schneider, Boston, MA, for Andrew J. Hammond, III, Petitioner.

### ORDER

YOUNG, Chief Judge.

The docket reflects the following entry.

"3/3/2005 [Chief] Judge William G. Young: Electronic Order entered. Order Adopting Report and Recommendation for [29] Report and Recommendations. Action on motion: After careful review of the entire record and review of the objections to the Report and Recommendation, the objections are overruled and the report and recommendation is adopted in its entirety. Accordingly, the petition for writ of habeas corpus is denied."

### *REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS (# 1)*

COLLINGS, United States Magistrate Judge.

#### *I. Introduction*

On or about January 2, 2002, Andrew J. Hammond, III ("Hammond" or the "petitioner") commenced the instant action by filing a petition for writ of habeas corpus (the "petition") pursuant to 28 U.S.C. § 2254(# 1), a supporting memorandum of law (# 3) and a supporting record appendix (# 4). On May 9, 2002, the respondent Paul Verdini ("Verdini" or the "respondent") submitted an Answer to the petition (# 7), Supplemental Answer (# 10) and a Motion to Dismiss the petition (# 8) with supporting memorandum of law (# 9) in which he argued that the petitioner's petition for writ of habeas corpus should be dismissed because the petitioner had failed to exhaust available state court remedies as to Ground 2 of the petition. On May 14, 2002, the petitioner submitted a Response to the Motion to Dismiss (# 11)[1] and on June 4, 2002, this Court issued a Report and Recommendation (# 13), recommending that Ground 2 of the petition be dismissed on the merits. On June 21, 2002, the District Court judge to whom this case is assigned (Wolf, J.) issued an Order (# 14) allowing the motion to dismiss as to Ground 2, ordering the respondent to file a memorandum of law addressing the merits of Grounds 1 and 3 of the petition and referring this case to the undersigned for the issuance of a Report and Recommendation. After being granted several enlargements of time, the respondent finally filed his memorandum in opposition to the petition on September 30, 2002(# 19).

On November 13, 2002, this Court issued a procedural order (# 23) requesting that the parties file additional memoranda of law directed to four specific questions. The parties timely filed such memoranda (*see* ## 24, 26), and on January 2, 2003, in response to a request from the Court, the respondent filed trial and hearing tran-

---

1. In the official docket of the case, entry # 11 is incorrectly titled "Response by Paul Verdini to motion to dismiss the petition"; in fact, entry # 11 is the response by the petitioner to Verdini's motion to dismiss.

scripts from the state court proceedings in this case. (# 28).

## II. The Facts and the Procedural History [2]

On April 26, 1994, a quarter-stick of dynamite taped to a rock crashed through the window of the residence at 15 Winter Road, Woburn, Massachusetts. (# 19 at p. 4). The device exploded in the hand of Jennifer Galante, injuring her severely and causing damage to the house. (# 19 at p. 4).

Some days before the April 26 explosion, the petitioner was with three friends in Billerica. (*Id.*). One of them, Leonard Pearlstein, had brought quarter-sticks of dynamite, sometimes called M–80's. (*Id.*). Pearlstein took a stick out, put it in a milk carton, lit the fuse and the four young men watched it explode. (# 19 at p. 4). The petitioner observed, "it could do a lot of harm." (*Id.*). He paid Pearlstein five dollars for a quarter-stick, and Pearlstein and the petitioner taped the quarter-stick to a rock. (*Id.*). On the tape was a hand written message saying, "Don't fuck with me [word missing] cunt." (*Id.*). The petitioner gave Pearlstein Jennifer Galante's address and directions to her house, saying that he wanted to scare her. (*Id.*).

On April 26, 1994, there was a gathering at Pearlstein's house at which Hammond and three others, Jeff McMillan, Marc Perry and Mark Hamilton, were present. (*Id.*). Later that day, the petitioner, McMillan, Pearlstein and Perry regrouped at Boomer's, a pool hall. (*Id.*). Perry stayed in the car in which he had arrived, a stolen BMW, while the others talked for some minutes. (*Id.*). Then, McMillan and Pearlstein rejoined Perry, McMillan announcing, "We are going for a ride in the car." (*Id.*). Pearlstein directed Perry to the Galante house, and when they arrived, McMillan got out of the car and returned in about forty seconds, shouting "go, go, go." (*Id.*). As they sped away, Perry heard a "big boom," followed by screams. (*Id.*). The three returned to Boomer's where the petitioner was in the parking lot and asked "was it done?" (*Id.*). Pearlstein said, "it was done" and the two slapped high five. (# 19 at p. 4).[3]

On June 6, 1994, a Middlesex County, Massachusetts grand jury returned five indictments against the petitioner. (*Id.* at p. 2). He was charged in two of the indictments with maiming Jennifer Galante and causing an explosion with injury to her; in the remaining three indictments, it was charged that the petitioner threw an explosive into Galante's house or possessed an explosive with the intent to damage property or injure a person, that he unlawfully possessed an infernal machine and that he conspired with Pearlstein and McMillan to throw explosives at or near

---

**2.** The petitioner's recitation of the facts and procedural history is set out at pp. 3–22 of the Memorandum of Law in Support of Petition for Writ of Habeas Corpus (# 3), and the respondent's version is at pp. 1–6 of his Memorandum in Opposition to Petition for Writ of Habeas Corpus (# 19). I hereby adopt the version of the facts recounted by the Massachusetts Appeals Court (the "appeals court") in *Commonwealth v. Hammond*, 50 Mass.App. Ct. 171, 736 N.E.2d 398 (2000). I presume all of those facts to be true as I must pursuant to 28 U.S.C. § 2254(e)(1). For the purposes of brevity, I restate only those facts that are relevant for purposes of issuing a Report and

Recommendation on the instant petition and at times quote the facts verbatim. (Citations are to the Respondent's Memorandum # 19, unless otherwise noted, rather than to the underlying decision by the appeals court).

**3.** At trial, the prosecution sought to show that the petitioner resented Galante for interfering in his relationship with his then-girlfriend, Jennifer Gibbons, who was also Galante's close friend. (# 3 at p. 8). The petitioner argues, however, that the evidence showed that there was no ill will between the petitioner and Galante and that the petitioner tried to "be civil" toward Galante. (*Id.* at p. 9).

persons or property. (*Id.*). On November 9, 1994, the petitioner moved to dismiss the indictments. (*Id.*).

On June 28, 1996, a Middlesex County Grand Jury returned three indictments, alleging that the petitioner was an accessory before the fact to three felonies committed by Pearlstein and McMillan: mayhem, causing an explosion which damaged property or injured a person, and willfully throwing, placing, or possessing an explosive with intent to injure a person or damage property. (# 19 at p. 2). On January 6, 1997, the Commonwealth of Massachusetts (the "Commonwealth") nol prossed[4] the five 1994 indictments. (*Id.*).

One of the witnesses at trial against the petitioner was one Darrin Turner. (# 3 at p. 10). Turner testified that sometime before the explosion at the Galante house, he spent time with the petitioner and Pearlstein and Harris in Billerica. (*Id.*). According to Turner, after Pearlstein pulled a "quarter stick" from his car, "stuck it in a milk carton," and exploded it, the petitioner stated that it "could do a lot of harm" and asked Pearlstein if he had any more. (*Id.*). According to Turner, the petitioner asked the others whether they "wanted to take a ride with him over to Woburn to scare his ex-girlfriend", specifically mentioning the name Jennifer Galante (although Galante had never been involved with the petitioner). (*Id.* at p. 11). Turner insisted that the petitioner told him that he wanted to scare Galante "cause a couple of weeks before they got in a huge fight and broke up." (*Id.*). Turner further testified that before the group dispersed, he believed that the petitioner gave Pearlstein five dollars for an M–80 along with directions to Galante's home and that Pearlstein put the M–80 underneath the seat in his car. (# 3 at p. 11).

When Turner eventually spoke to the police about the incident over two years later, he was directed by the police to draft a handwritten statement. (*Id.* at pp. 11–12). Trooper Mark Horgan, one of the interrogating officers, testified that he took Turner's statement and rewrote it himself because Turner's original statement did not encompass everything. (*Id.* at p. 12). He then gave the rewritten statement back to Turner, had him read it, initial it and sign it. (*Id.*).

After trial, Turner admitted that not everything in the statement drafted by Horgan was true, including the assertion that the petitioner had taped the quarter stick to the rock. (*Id.* at pp. 12–13). Turner claimed that he was not "promised anything" by the police officers in connection with his trial testimony. (*Id.* at p. 13).

On January 10, 1997, a jury convicted the petitioner of being an accessory before the fact to causing a malicious explosion and of so much of the other felony as alleged throwing and possessing (but not placing) an explosive with intent to injure a person and damage property; the jury acquitted the petitioner of being an accessory before the fact to mayhem. (*Id.*).

On February 7, 1997, the trial judge (Zobel, J.) sentenced the petitioner to two consecutive terms in state prison: 18–20 years on the malicious explosion charge and 12–15 years on the remaining charge. (# 19 at p. 3). The petitioner filed a notice of appeal on the same day, and on November 18, 1997, the petitioner filed a motion for new trial. (*Id.*). On May 11 and 13, 1997, the trial judge held an evidentiary hearing on the motion and heard testimony from four witnesses. (*Id.*). The petitioner's motion for new trial was supported by affidavits from Turner and McMillan repu-

---

**4.** "Nol prossed" is short for nolle prosequi, meaning that a party has declared that "he will no further prosecute the case." *Black's Law Dictionary* (4th ed., 1988) at 1198.

diating trial evidence regarding the petitioner. (# 3 at p. 17). At the evidentiary hearing, the petitioner's counsel sought to call McMillan, but the judge excluded McMillan's evidence, ruling that by pleading guilty prior to the petitioner's trial, McMillan waived his right against self-incrimination and that therefore his testimony was not "newly discovered." (*Id.* at pp. 17–18). The judge, however, permitted Turner to assert his privilege against self-incrimination when the petitioner's counsel attempted to question him about his recantation. (*Id.* at p. 18). The petitioner's counsel was allowed to introduce into evidence Turner's affidavit recanting much of his trial testimony. (*Id.*).

At the evidentiary hearing, evidence emerged for the first time that the Fire Marshall's office had been offering a financial reward for information leading to the arrest and conviction of the persons responsible for the bomb at the Galante's house, that Horgan submitted Turner's name to the committee responsible for awarding the money, and that at some point after trial Turner received $2500 for providing information. (# 3 at p. 21).

On January 19, 1999, Judge Zobel denied the petitioner's motion for new trial. (# 19 at p. 3). On February 11, 1999, the petitioner filed a notice of appeal from the denial of the motion and that appeal was consolidated with the petitioner's direct appeal. (*Id.*). On October 5, 2000, the Appeals Court affirmed the petitioner's convictions, and on January 3, 2001, the Supreme Judicial Court denied the petitioner's application for further appellate review, which had been filed on November 22, 2000. (# 3 at pp. 4–5). On January 2, 2002, the petitioner timely filed the instant petition. (*Id.* at p. 5).

### III. Analysis

Title 28 U.S.C. § 2254(d)(1), the applicable habeas corpus statute, sets out that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The petitioner has asserted that he is entitled to habeas relief based on two[5] separate grounds. Those grounds are as follows:

Ground One: The petitioner has been unconstitutionally convicted and given consecutive sentences for the crimes of malicious explosion and willful throwing or possession of an explosive device and the state appeal's [sic] court's ruling employed a constitutionally improper and unreasonable methodology in construing the underlying statutory provisions (# 3 at p. 23); and

Ground Three: The state appeal's [sic] court's ruling upholding the trial court's decision that the prosecution did not violate its *Brady* obligations by suppressing evidence that a key witness received a reward for his trial testimony involved an "unreasonable determination of the facts in light of the evidence

---

**5.** As discussed *supra*, the petitioner originally premised his petition on three separate grounds, but on June 21, 2002 the District Court (Wolf, J.) issued an order dismissing Ground 2. (*See* # 14). Throughout the rest of this Report and Recommendation, I will refer to the remaining grounds as Ground 1 and Ground 3.

presented" and constituted an unreasonable application of clearly established federal law.

# 3 at p. 42.

Because I will recommend that the petition be denied, I will address both of the grounds raised by the petitioner and explain why neither provides a basis for habeas relief. In short, I must determine whether either of the state court legal determinations was "contrary to" or an "unreasonable application of" established Supreme Court law or whether the state court decisions were based on unreasonable determinations of facts in light of the evidence presented. In order to make such determinations, it is necessary first to set forth the applicable standards.

### A. Standards

#### 1. "Contrary to" Standard

The Supreme Court in *Williams v. Taylor*, explained that:

> a state court decision would be "contrary to" the [Supreme] Court's clearly established precedent if it "applie[d] a rule that contradicts the governing law set forth in [the Court's] cases".... "A state-court decision will also be contrary to th[e] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from our precedent."

*Hurtado v. Tucker*, 245 F.3d 7, 15 (1 Cir., 2001), *cert. denied*, 534 U.S. 925, 122 S.Ct. 282, 151 L.Ed.2d 208 (2001) (quoting *Williams*, 529 U.S. 362, 405–06, 120 S.Ct. 1495 (2000)).

In deciding whether the "contrary to" prong applied in that case, the *Hurtado* court stated that "this case presents a good example of one to which § 2254(d)(1)'s 'contrary to' prong does not apply: 'a run-of-the-mill state-court decision applying the correct legal rule from

[the Supreme Court's] cases to the facts of a prisoner's case." ' 245 F.3d at 15 (quoting *Williams*, 529 U.S. at 406, 120 S.Ct. 1495).

#### 2. "Unreasonable Application of" Standard

The Supreme Court in *Williams* held that a state court decision would involve an 'unreasonable application of' clearly established Supreme Court precedent if it "identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case...." The Court also underscored that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law...." Indeed, because Congress used the word "unreasonable" in § 2254(d)(1), and not words like "erroneous" or "incorrect", a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

*Hurtado*, 245 F.3d at 15–16 (quoting *Williams*, 529 U.S. at 410–11, 120 S.Ct. 1495)(internal citations omitted)(emphasis in original).

The *Hurtado* court explained further that "the Supreme Court in *Williams* explicitly rejected the view...that an 'unreasonable application of' clearly established federal law requires that the application be one that *all* reasonable jurists would agree was unreasonable.... Thus, the test is an objective one and not so stringent as to require that all reasonable jurists agree the state court decision was unreasonable." 245 F.3d at 17 (emphasis in original); *see also McCambridge v. Hall*, 303 F.3d 24, 36 (1 Cir., 2002)(overruling *O'Brien v. Dubois*, 145 F.3d 16, 25 (1 Cir., 1998) and *Williams*

*v. Matesanz*, 230 F.3d 421, 429 (1 Cir., 2000), holding that for a state court determination to be considered an "unreasonable application" of federal law, there must be "some increment of incorrectness beyond error" such that the decision is considered unreasonable in the "independent and objective judgment of the federal court."). I must decide now whether any of the state court's determinations in the petitioner's case were contrary to or unreasonable applications of established Supreme Court precedent.

### B. The Petitioner's Asserted Grounds for Habeas Relief

#### 1. The "Double Jeopardy" Ground

■ The petitioner argues that the state appeals court's decision on the double jeopardy claim was both contrary to the law established in *Blockburger v. U.S.*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) and its progeny and involved a "completely" unreasonable application of that law. (# 3 at p. 28). The gist of the double jeopardy claim is that the petitioner was given duplicative punishments for the crimes of malicious explosion and willful throwing or possessing of an explosive and was therefore subjected to double jeopardy. Not surprisingly, the respondent disagrees with the petitioner, asserting that the appeals court decision was neither contrary to, nor an unreasonable application of, established federal law because each crime for which the petitioner was convicted contains an element the other does not. Thus, there cannot be a double jeopardy issue. (# 19 at p. 8).

The obvious starting point for an analysis of Ground 1 is a review of the *Blockburger* principal, relied on by the petitioner. In *Blockburger*, the Supreme Court adopted the following rule which had first been set out in *Morey v. Commonwealth*, 108 Mass. 433 (1871): "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." 284 U.S. at 304, 52 S.Ct. 180. Thus, the petitioner asserts that the appeals court's decision— upholding the convictions under Mass. Gen. L. c. 266, § 102 (hereinafter, " § 102") and Mass. Gen. L. c. 266, § 101 (hereinafter, " § 101")-was contrary to and involved an unreasonable application of the so-called *Blockburger* rule because § 102, on its face, is a lesser included offense of § 101. And, therefore, because the petitioner was convicted of being an accessory to the crime set out in § 102 as well as the one in § 101, he was subjected to double jeopardy.

Determining whether the petitioner was subjected to double jeopardy requires a close reading of the two statutes at issue. Section 101 sets forth, in relevant part, that it is a crime to "wilfully, intentionally and without right, by the explosion of gunpowder or any other explosive, unlawfully damage[ ] or destroy[ ] property or injure[ ] a person...." Section 102 sets out that:

> Whoever wilfully and intentionally throws at or near any person and whoever wilfully, intentionally and without right throws into, against or upon, any property real or personal, or puts, places or explodes or causes to be exploded in, upon or near such property, or near any person, gunpowder or other explosive, or a bombshell...*with an intent unlawfully to destroy or damage property or to injure any person,* or whoever has in his possession or under his control such an article or instrument with said intent, shall be punished... (emphasis added).

The petitioner concedes that § 101 requires proof of a completed explosion which actually damages or destroys property or injures a person while § 102 does

not require such proof; he further concedes that § 102 requires proof that the explosive was thrown, put, placed, exploded, caused to be exploded or otherwise possessed with the requisite intent whereas § 101 requires only intent to cause an explosion. (# 3 at p. 29). The petitioner goes on to argue, however, that it is logically impossible to cause the explosion required by § 101 without actually or constructively possessing, placing, or throwing the explosive as required by § 102 and therefore § 102 must be a lesser included offense [6] of § 101. (*Id.*). The appeals court did not buy the petitioner's attenuated argument, ruling that:

> Section 101...describes causing an unlawful explosion that occurs and damages or destroys property or injures a person. It is a completed act. The offense described by § 102, the throwing statute, may not be a completed act. It is possible to offend against the statute by throwing an explosive device at or near a person or throwing it into property, without having the device explode; or, the device may explode and cause no damage or injury....Although an explosion may occur in each statute, the throwing offense involves the additional fact or element of throwing, which the malicious explosion statute does not. There is-at least the Legislature could so conclude-a special element of terror in hurling an explosive at a person or into property. It is quite possible to cause an explosion without throwing the explosive. The act of the [petitioner], therefore, offends against two statutes, even though it arose out of one incident.

*Commonwealth v. Hammond*, 50 Mass. App.Ct. 171, 174–75, 736 N.E.2d 398, 402 (2000) (citations and footnote omitted).

The appeals court was not swayed by the petitioner's logic and nor am I. The appeals court's ruling was consistent with the *Blockburger* rule; specifically, the appeals court found that each statute at issue here (§ 101 and § 102) requires proof of an element which the other does not. Simply put, § 101 requires a completed explosion, § 102 does not; Section 101 requires property damage or injury to a person whereas § 102 does not. Finally, § 102 requires either a throwing of the explosion or requires a specific intent to "damage property or injure any person"; § 101 does not—it does not require a "throwing" and it requires only the intent to cause an explosion, not the intent to cause injury or damage.

In short, nothing in the appeals court's ruling was contrary to or an unreasonable application of the *Blockburger* precedent. It is clear that both § 101 and § 102 contain an element the other does not. And, it appears that the petitioner was misreading § 102 in arguing that § 102 in its entirety is a lesser included offense of § 101. In applying *Blockburger* to determine when a crime is a lesser included offense of another, "the relationship of the two offenses must be like that of concentric circles rather than overlapping circles." *Aparicio v. Artuz*, 269 F.3d 78, 97 (2nd Cir.2001)(quoting 4 Wayne R. LaFave et al., *Criminal Procedure*, § 17.4(b)(2d ed.1999))(internal quotations omitted). In other words, every violation of § 101 must necessarily entail a violation of § 102 (the purported lesser included offense). *See U.S. v. Woodward*, 469 U.S. 105, 107, 105 S.Ct. 611, 83 L.Ed.2d 518 (1985)(holding that proof of a currency reporting violation does not necessarily include proof of a false statement offense and therefore the

---

**6.** The petitioner can be said to have sufficiently exhausted the "lesser included offense" argument by asserting to the Appeals Court that

"the elements of § 102 are subsumed in § 101..." *Hammond,* 50 Mass.App.Ct. at 173, 736 N.E.2d at 401.

false statement crime is not a lesser included offense and defendant could be convicted of and punished for both offenses).

■ Here, it is apparent, using the *Blockburger* analysis, that § 102 is not a lesser included offense of § 101. Quite simply, every violation of § 101 would not necessarily entail a violation of § 102. Section 101 requires, in brief, an intentional explosion and personal injury or property damage. Section 102, on the other hand, requires the throwing of an explosive at a person *or* the throwing of an explosive at property or the placing, putting, or exploding of the explosive with the intent to injure a person or damage property *or* the possession of an explosive device with the same intent. In other words, there are seven separate crimes set forth in § 102[7]- (1) the throwing of an explosive at a person; (2) the throwing of an explosive at property; (3) the putting of an explosive near property or person with the intent to damage the property or injure the person; (4) the placing of an explosive near property or person with the intent to damage the property or injure the person; (5) exploding an explosive near property or person with the intent to damage the property or injure the person; (6) causing an explosive to be exploded near property or person with the intent to damage the property or injure the person; and (7) possessing an explosive with the intent to damage property or injure a person.[8]

Thus, the first two crimes set out in § 102 clearly are not lesser included offenses of § 101 because one could cause an explosion without throwing the explosive device. The last five crimes set out in § 102 might be lesser included offenses of § 101, were it not for the intent requirement in § 102–that is, § 102 requires that one put, place, cause to explode, explode or possess the explosive *with the intent to damage property or injure a person.* Thus, every violation of § 101 cannot entail a violation of § 102. There are many imaginable scenarios in which a person might intentionally cause an explosion (as required by § 101) which ultimately causes property damage or personal injury (as required by § 101) without the person ever having formed the *intent* to damage property or injure a person (as required by § 102). Therefore, there is no way that any of the seven crimes set out in § 102 can be said to be a lesser included offense of § 101. Two of the seven crimes in § 102 require a throwing of an explosive; the other five require intent to damage property or injure a person. Section 101 requires neither the throwing of an explosive nor specific intent to injure property or damage a person. That statute requires only intent to cause an explosion, an explosion and resulting damage or injury. Thus, the crimes set forth in § 102 are not subsumed in § 101 and are not lesser included offenses.

The petitioner glosses over the fact that the last five offenses set out in § 102

---

7. The petitioner urges the Court to look at § 102 as containing six alternative theories of the single offense of possessing and delivering an explosive device, rather than as six (or seven) separate offenses. (# 26 at p. 5). But, there is nothing in the statute to support the petitioner's position. And, his argument does not seem logical-if § 102 contained only separate theories of the same offense, then why would the petitioner (and others) be indicted for and convicted of more than one subsection of § 102? In any event, the Court need

not address this argument in depth as this is the first time that the petitioner has made such an argument. That is, any argument that § 102 must be interpreted in the way petitioner suggests cannot be said to be exhausted.

8. The petitioner was convicted of being an accessory before the fact to crimes (1)(2) and (7): throwing at a person and at property and possessing the explosive device with the requisite intent. (# 4 at R. 37–38).

require a specific intent to cause injury or damage, even if that injury or damage never occurs. That intent requirement is the factor that differentiates § 102 from § 101 and leads to the ultimate conclusion that the last five crimes in § 102 are not lesser included offenses of § 101.[9] Judge Zobel, during the state court proceedings, addressed the intent requirement of § 102 at various points-for example, he instructed the jury that: the petitioner was charged with being an accessory to "exploding an explosive to intentionally and maliciously damage property or injure a person...." (# 28, Transcript Vol. 2, p. 37); "the government must prove, beyond a reasonable doubt, that the actor...put, or exploded, or caused to be exploded either in, upon, or near the property, or near any person...an explosive...with the intent...of destroying or damaging the property or injuring the person." (# 28, Transcript Vol. 4, p. 190); and "the government must prove beyond a reasonable doubt that the intention was to unlawfully destroy or damage the property." (*Id.* at Vol. 5, p. 99). Thus, even if there is a legitimate argument that § 102 or parts thereof are lesser included offenses of § 101 (and the Court takes the position that no such argument could withstand scrutiny), the trial court's interpretation of § 102, and the appeals court's affirmance of the petitioner's convictions cannot be said to be unreasonable applications of or contrary to established federal court law. The state court determinations were consistent with *Blockburger.*

In short, for the reasons discussed above, the petitioner is not entitled to habeas relief on the grounds that he was subjected to double jeopardy. The petitioner also makes a related argument, however, that the appeals court ruling was based on a fundamentally flawed methodology: "finding that the defendant was convicted of *throwing* an explosive device, rather than of otherwise *placing* it, the Appeals Court surmised that the Legislature 'could' have determined that there was a 'special element of terror in hurling an explosive at a person or into property....' [T]here is nothing in the legislative scheme...which supports this speculative assertion." (# 3 at pp. 31–32)(emphasis in original). The appeals court's conjecture notwithstanding, as discussed at length above, there is nothing in the appeals court's ruling that was contrary to or an unreasonable application of *Blockburger.*[10] The appeals court's affirmance of the petitioner's separate convictions under § 101 and § 102 was consistent with a proper interpretation of the statutes and his convictions did not amount to double jeopardy. Thus, I will not recommend that a writ of habeas corpus issue on the bases set forth in Ground 1.

### 2. The Brady Ground

The petitioner next argues that he is entitled to habeas relief because the appeals court's ruling upholding the trial court's decision that the prosecution did not violate its *Brady* obligation by suppressing evidence that Turner received a reward for his testimony was an "unrea-

---

9. As previously stated, the first two offenses in § 102 clearly are not lesser included offenses of § 101 because they require the throwing of an explosive.

10. Moreover, while the petitioner's argument that it is simply not possible to effect a completed explosion contemplated by § 101 without *either* throwing an explosive, *or* placing it, *or* putting it, *or* exploding it, *or* causing it to

be exploded, *or* possessing it as provided for in § 102 may be valid, it misconstrues § 102. It is entirely possible to effect the explosion without throwing the explosive, and as discussed *supra,* one could cause an explosion which violated § 102 but did not violate § 101 if no damage or injury occurred even though the intent to cause such injury or damage was present.

sonable determination of the facts in light of the evidence presented" and constituted an unreasonable application of clearly established federal law. (# 3 at p. 42). The respondent disputes the petitioner's argument, positing that the appeals court's decision was appropriate because after an evidentiary hearing there was no evidence that the government had made promises of a reward to Turner in exchange for his trial testimony. (# 19 at p. 13). I agree with the respondent.

In the applicable Supreme Court precedent, *Brady v. State of Maryland*, the court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In determining whether the petitioner is entitled to relief, I need decide only whether the appeals court's affirmance of the trial court's decision was reasonable. That is, I need not second guess every decision by the state courts but need determine only if the decision reached by the appeals court was unreasonable in light of the facts and evidence or was an unreasonable application of established Supreme Court precedent.[11] If so, then the petitioner would be entitled to habeas relief.

 With regard to the petitioner's argument that the prosecution withheld potentially exculpatory evidence, the appeals court stated, in pertinent part, that:

In connection with the motion for a new trial, there was extensive testimony heard by the [trial] judge from the State trooper from the Fire Marshal's office, Mark Horgan, and the Woburn police detective, Michael Pandolph, both of whom interviewed Turner during the investigation of the explosion.... No evidence developed that they made any promises of reward to Turner. Nor does Turner's own affidavit mention a reward for the testimony that he states in the affidavit was false. The judge acted within his discretion in finding that no promise of reward had in fact been made to Turner.

*Hammond,* 50 Mass.App.Ct. at 178, 736 N.E.2d at 404.

The appeals court found, in short, that *no* evidence was uncovered that Turner was offered a reward for his incriminating testimony.[12] Indeed, the petitioner himself can say at best only that "there was evidence that the reward program had been in place since the early stages of the investigation; that Horgan...personally nominated Turner; and that reward money had actually been received by Turner...in exchange for his testimony linking the [petitioner] as an accessory before the fact." (# 3 at pp. 50–51, 736 N.E.2d 398). In sum, the petitioner has not pointed to any evidence, in the form of testimony from Horgan or Pandolph, or otherwise, that would establish that Turner at the time he testified knew that he was going to receive a reward.[13]

11. The petitioner does not make the argument here that the appeals court's decision was contrary to established federal law, only that it was an unreasonable application of that law.

12. As both the petitioner and respondent state, this Court must defer to the state court findings of fact and the presumption of correctness applies when a state appellate court

makes such a finding of fact. *See Sumner v. Mata (Sumner I),* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) and *Sumner v. Mata (Sumner II),* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982).

13. The petitioner's strongest evidence on this point is that Horgan testified that he was "not sure" whether the reward money was discussed with Turner. (# 3 at p. 51).

Due to the dearth of concrete evidence regarding Turner's actual knowledge of the reward, the argument relied on by the petitioner is that neither the trial court nor the appeals court made any factual findings concerning Turner's receipt of the reward money and that had the appeals court properly evaluated the evidence "it would have been hard pressed to conclude that the reward money was bestowed on Turner without any prior discussion." (# 3 at p. 52). Further, argues the petitioner, the prosecution violated its *Brady* obligation by failing to turn over evidence of the reward because "evidence of the reward constitutes powerful impeachment material that could have spelled the difference in the jury's assessment of Turner's credibility." (*Id.* at pp. 52–53).

While it is possible that another court might have decided differently, it certainly was not unreasonable for the appeals court here to find that the trial judge acted within his discretion in finding that no promise of a reward had been made to Turner. The trial judge heard *no* testimony that the promise of a reward had been made to Turner and indeed, Turner himself never mentioned the reward in his affidavit.[14]

As mentioned above, *Brady* requires that the government turn over potentially exculpatory evidence to the defense. Here, the trial court found that no such potentially exculpatory evidence existed (that is, there was no evidence that a reward had been offered to Turner in exchange for his testimony)[15], and the appeals court upheld the trial court's decision. Thus, it was perfectly reasonable for the state court to conclude that the prosecution did not violate its *Brady* obligation since certainly the government cannot be required to turn over nonexistent evidence. *See e.g., U.S. v. Taylor,* 253 F.3d 1115, 1117 (8 Cir.,2001)("because no tapes existed, [defendant] was not prejudiced and there is no *Brady* violation."); *Strube v. U.S.,* 206 F.Supp.2d 677, 688 (E.D.Pa., 2002)("the government did not violate the dictates of *Brady* by failing to turn over something that did not exist."). In sum, the appeals court did not apply *Brady* unreasonably nor did it act unreasonably in light of the relevant facts and circumstances. Thus, Ground 3 does not provide the petitioner with a basis for habeas relief, and I must, therefore, recommend that the petition for writ of habeas corpus be denied.

## IV. Recommendations

For the reasons stated, I RECOMMEND that the petitioner's petition for writ of habeas corpus (# 1) be DENIED.

## V. Review by the District Judge

The parties are hereby advised that pursuant to Rule 72, Fed.R.Civ.P., any party who objects to these proposed findings and recommendations must file a specific writ-

---

**14.** As an aside, it appears that nothing would have prevented Turner from discussing the reward in his affidavit. Turner's affidavit is a comprehensive recantation of almost every incriminating fact about which he had previously testified. (*See, e.g.,* # 4 at R. 43–45, ¶¶ 2–6). While it is certainly regrettable and shocking that Turner would apparently perjure himself in order to incriminate the petitioner, there is nothing in the record before me that demonstrates that the appeals court applied *Brady* unreasonably or acted unreasonably in light of the facts and evidence.

**15.** Evidence of the reward in and of itself, not evidence that the reward was offered to Turner, does not seem to be potentially exculpatory. Even if some courts might determine that evidence of the reward itself should be turned over under *Brady*, the fact that the state court in this case did not so decide cannot be said to be unreasonable in light of the relevant facts or an unreasonable application of *Brady*.

ten objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed.R.Civ.P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services,* 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia–Copete,* 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).